Mr. Justice Wylie
delivered the opinion of the court.
This action was brought to recover damages sustained by the surviving husband in consequence of injuries which happened to his wife on the 2d December, 1872, from the carelessness of defendant’s servants and agents, as alleged, from which she died the 3d of January, 1873. The verdict was in favor of the plaintiff for $3,568.25. Several exceptions were taken to rulings of the court before which the case was tried at circuit, and among them the refusal of the court to set aside the verdict for excessive damages. In cases tried under the common law, the refusal of the court to set aside a verdict on this ground cannot be alleged for error in the appellate court, but the decision of the court below is final. It is claimed, however, that this rule has been changed by the following provision of the act under which this court was established: “The justice who tries the cause may, in his discretion, entertain a motion to be made on his minutes to set aside a verdict and grant a new trial on exceptions or for insufficient evidence, or for excessive damages; provided that such motion be made at the same term or circuit at which the trial was had. When such motion is made and heard upon the minutes, an appeal to the general term may be taken from the decision, in which case a bill of exceptions or case shall be settled in the usual manner.”
A bill of exceptions, properly speaking, always relates to some ruling of the court on a question of law. The act of Congress enables tbe court before which the trial was had, to grant a new trial, if it become satisfied that an error in law was committed to which exception was taken at the time. And this it could do under the common law. But a verdict rendered on insufficient evidence or for excessive damages, is the error of the jury as to evidence, and whether erroneous for either of these causes, is a question which can be judged *49 of only from the evidence. It is not possible, therefore, for an appellate court, unless it have all the facts before it, to say whether the verdict was sustained by the evidence or not. Even were all the evidence given at the trial taken down in writing and sent up with the record, the appellate court could not determine the question. For that would be to usurp the province of the jury in finding what facts have been established by the evidence. Ad questionem faeti non respondentjudiees; ad questionem legis non respondent juratores. But if a case have been settled by agreement of the parties stating, not the evidence in the cause, but facts admitted on both sides to be established by the evidence, the appellate court could as well decide the motion for a new trial as any ■other question of law, for the trial arises out of the facts. Where the act of Congress, therefore, says that when a motion ■for a new trial has been made and heard upon the minutes of the court below, to set aside a verdict and grant a new trial on exceptions, or for insufficient evidence, or for excessive damages, and, on an appeal from the decision made, a bill of exceptions, or case shall be settled in the usual manner, it intends that the questions of law involved in the bill of exceptions shall be taken up in that shape: and that the motion for a new trial, for insufficient evidence or for excessive •damages, must rest upon an agreed case.
We have dwelt upon this point at some length, for the reason that the act of Congress on the subject is not expressed with all the clearness that one would desire, and because different views have been entertained as to its construction. The facts established by the evidence in the present case, not having been settled by counsel, we think we have no proper means furnished us from which to judge whether the verdict, in this instance, was excessive or otherwise.
After the evidence on both sides was closed, several prayers were presented to the court by the defendant, and one only by the plaintiff. The plaintiff’s prayer was granted, and some of the defendant’s were granted, and others refused. We do not deem it necessary, however, to examine the rulings of the court in answer to these several propositions of law in their order, since we are of opinion that a new trial ought to be granted, for what we consider an erroneous instruction *50 contained in the charge, and the substance of which, seems to pervade all the instructions as to which exceptions were taken by the defendant. That part of the charge to which we refer more particularly is in these words: “ I hold, if the proclamation of arrival at Washington was made, it is to be presumed it was made by an employé of the company until the contrary is shown, and if made by other sources tham the authority of the company, that it should have been countermanded by the company.” The same idea pervades, and is much enlarged upon, in a subsequent part of the charge,, from which we make one further extract, as follows: “ And if the proclamation came either from the mouth of their agent (the company’s,) or was unauthorized, but was uncontradicted through their agency, under the law, the company would be-derelict in its duty, and chargeable with the consequences.” To the law, as thus ruled by the court, exception was taken at the time by the defendant’s counsel. The court by these-rulings took away from the jury even the question of contributory negligence on thé part of the deceased. Under circumstances very similar to those of this case, the Court of Exchequer Chambers, in Bridges vs. The North London Railway Company, L. R., Q. B. 6, p. 377, ruled that it was the duty of the court to instruct the jury, as matter of law, that the plaintiff was not entitled to recover. The facts of that case, as they are correctly set- out in the head-notes of the report, were as follows: In an action against the defendant by the executrix of B to recover damages for his death, alleged to have been caused by the defendant’s negligence, the following evidence was given on behalf of the plaintiff:
B was a passenger by the defendant’s railway from London to Highbury. He was a season-ticket holder, and traveled to and fro every day; he was very short-sighted. The train consisted of six carriages. B rode in the middle compartment of the last carriage. On approaching Highbury station from London, the railway passes through a tunnel. At the further end of the station is a broad platform far exceeding the length of the train; then a narrow platform, about 12 feet of which is within the tunnel; then a slope of 10 feet from the platform to the level of the rails, and beyond this a heap of hard rubbish extending some way into the tunnel about a foot *51 lower than the platform. The train stopped at the station, the last two carriages being still in the tunnel, and the carriage in which B rode being opposite the heap. A passenger who rode in the next carriage, as the train stopped, heard “Highbury” called out at the far end of the platform. . He got out, and then heard a groan in the tunnel, and on going back he found B lying on the heap with his legs between the wheels of the carriage, but they had not passed over him. The passengers also heard “ Keep your seats ” called out, and the train then moved forward toward the platform. One of B’s legs was broken, and he had received internal injuries, of which he died; it was after dark. There was a lamp within the tunnel near the entrance, about 28 feet from where B was found; the tunnel was-full of steam.
The judge non-suited the plaintiff, giving her leave to move to enter a verdict, “if the court considered there was any evidence of negligence on the part of the defendants which could properly be left to the jury.”
The Court of Q. B. refused a rule.
On appeal to the Exchequer Chamber, it was held by four of the judges that there was not evidence on which a jury could properly have found for the plaintiff, and the non-suit was therefore right. • The same judges held that the question of whether there was contributory negligence on the part of the deceased was still open on the above reservation.
Three of the judges contra on both points.
By the whole court, that the calling out the name of the station is not in itself an invitation to the passengers to alight; whether it is so or not must depend on the circumstances of each particular case.
In the ease just cited, the train had arrived at its destination, but the carriage in which was the passenger had not come up to the platform and stopped. It was a dark night, and the passenger in question was near-sighted. . Proclamation was made by some one at the far end of the carriage, “ Highbury.” It did not appear by whom this proclamation was made, but it was not contradicted, and was probably uttered by some agent of the company. Thereupon the passenger in question left his seat and proceeded to alight. He fell upon a heap of rubbish, with his legs in front of one of *52 the wheels. Another proclamation was then made to the passengers in the train, “Keep your seats,"-and the train moved forward, crushing the man’s legs and inflicting other injuries, of which he subsequently died. Four of the seven judges of the Court of Exchequer Chamber held that the decision of the court below directing the plaintiff to be non-suited, without so much as leaving the question of negligence to the jury, was correct; and all seven of them held that the calling out the name of the station was not in itself an invitation to the passengers to alight. In this case all the authorities previously decided in England, bearing upon the question, were cited; the cause was fully argued, and the judges all gave their opinions seriatim.
We all know, from our own experience, that it is customary for conductors to announce the name of a station to the passengers before the platform has been actually reached, so that they may have time to gather up their impedimenta, put on their over-garments, and in other respects prepare to alight. We know, also, how often it happens that in approaching the station, particularly in a city, the trains stop for a brief period before reaching the landing or depot. The shifting of trains from one track to another, or other causes produced by the necessities of trade in a large city, where it is important that the public highways should be obstructed as little as possible by the business of railways, render such stoppages inevitable. Men who travel are presumed to be reasonable beings, and to exercise ordinary care for the safety of their own persons, and yet wherever men are found, whether at home or abroad, accidents do happen to some, which are the direct results of their own imprudence. In such cases it would not be just to require others to make them compensation in damages. If men are to be transported as freight upon railways and rivers, and their carriers held to the responsibility of insurers, they should suffer themselves to be handled as freight, and wait in their seats till they can be landed upon the platform by the agents of the transporters. Where intelligence exists, however, there must be accountability to itself at least, for the consequences of its own imprudence. While we hold that railway companies should be held to the full measure of their responsibilities, *53 yet it must be admitted that their business is of incalculable advantage to the public. They should be made to suffer, in damages, for their own negligence or mismanagement, where it is proved, but it is the duty of courts to hold the scales of justice even in the trial of their causes, where juries are. so liable to be led astray by prejudice against them, or by sympathy and favor for the private citizen.
Cartter, Ch. J., dissenting.